**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Reylene Sanchez,<br><br>　　　　Plaintiff,<br><br>v.<br><br>JPMorgan Chase Bank NA,<br><br>　　　　Defendant. | No. CV-21-00896-PHX-JAT<br><br>**ORDER** |

At issue is Defendant JPMorgan Chase Bank, N.A.'s Motion for Summary Judgment (Doc. 54). The Court now rules on this motion.

## I.　　FACTUAL BACKGROUND

The following facts are either undisputed or recounted in the light most favorable to the non-moving party. *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

### a. The Chase Credit Card

Plaintiff Raylene Sanchez applied for and received a Chase credit card in March of 2017. (Doc. 54 at 6). Although she regularly paid her bill throughout 2017, she failed to make payments for February, March, and April of 2018. (Doc. 54-10 at 7). By this time, Plaintiff owed $4,830.00 to Chase. (*Id.*). The account was marked 120 days past due. (*Id.*).

To address this issue, Chase and Plaintiff had a phone call to discuss settling the account and resolving her outstanding debt. (*See* Doc. 54 at 6). According to the settlement agreement reached between Chase and Plaintiff, Plaintiff was to pay four installments of $484.00 to Chase. (*See* Doc. 54-8 at 2–3). The total settlement amount was $1,933.00 (*Id.*).

Plaintiff made her final payment in September 2018. (Doc. 54-9 at 2). At that time, Chase updated the information that it furnished about Plaintiff to show that the account was closed with a $0.00 balance, that it was 120 days delinquent, and that it was settled for less than the full balance. (*See* Doc. 54 at 6; Doc. 54-10 at 7).

Chase furnished this information in accordance with the Metro 2 Standards, the credit reporting industry standards set forth by the Consumer Data Industry Association. (*See* Doc. 54 at 6; Doc. 54-12 at 3). Metro 2 is a reporting "language" that breaks down the various characteristics of a customer's account into a series of numerical codes. (*See* Doc. 54-12). Credit information furnishers, such as Chase, must enter the appropriate codes in the various fields when furnishing information to Consumer Reporting Agencies ("CRAs"). (*See id.*). The Metro 2 Standards include instructions for the "Account Status" and "Payment Rating" fields, two fields Chase reported to the CRAs. The standards state that the "Account Status" field "[c]ontains the status code that properly identifies the current condition of the account as of the Date of Account Information..." (*Id.* at 31). Metro 2 sets the account status date for code 13 as the date when the account was closed to further charges. (*See* Doc. 54-12 at 36). Code 13 means that the account was paid and closed with $0.00 balance. (*See* Doc. 54 at 7). The standards also state that when an account status code of "13" is reported, the "Payment Rating" must also be reported. (*See id.*). Because it was required to do so under Metro 2, Chase included a Payment Rating of 4, which indicates that the account is 120-149 days overdue. (*See id.*).

**b. The FCTA Lawsuit**

Two years after settling her account with Chase, Plaintiff pulled her consumer credit reports in anticipation of applying for a mortgage. (Doc. 60 at 7–8). The consumer report included a notation in the "pay status" field indicating that the account was at some point late. (Doc. 60 at 8).[1] It also specifically stated that "[f]or accounts that have been paid and closed, sold, or transferred, Pay Status represents the last reported status of the account."

---

[1] The "Pay Status" field only appears on consumer credit reports. (*See* Doc. 54 at 8). It is not a field that furnishers are required to furnish information for because it is not part of the Metro 2 reporting "language." (*See id.*). Consequently, Chase never furnished a "pay status" to anyone.

- 2 -

(Doc. 54-10 at 2). In response to this, Plaintiff submitted a dispute to two CRAs, Equifax and TransUnion. (*See* Doc. 60 at 8). She claimed that there was an error in her credit report due to the fact that a delinquency was being reported in the "Pay Status" field. (*See id.* at 8). Creditors reading her report, she asserts, would interpret this as a current delinquency. (*See id.* at 11).

Upon receipt of the dispute, Chase conducted an investigation. (*See id.* at 8). It looked at its internal records and verified all of the information that it was furnishing to the CRAs. (*See id.*; Doc. 54-14). It did not pull a "bullseye" or "Automated Data View," however. (*See* Doc. 60 at 8). These forms show furnishers the reported tradelines for a consumer. (*See* Doc. 54-13 at 32). After concluding its investigation, Chase made a few minor updates, but kept reporting a payment rating of 120 – 149 days past due. (*See* Doc. 54-2 at 2).

In 2021, Plaintiff applied for a Barclays credit card. (*See* Doc. 60 at 8). She was denied for four reasons: 1. Serious delinquency, and public record or collection filed, 2. Time since delinquency is too recent or unknown, 3. Debt to income ratio too high, 4. Too many recent applications. (*See* Doc. 54-18 at 2). Plaintiff subsequently hired a credit repair company. (*See* Doc. 60 at 9).

## II.     PROCEDURAL BACKGROUND

On May 20, 2021, Reylene Sanchez sued JPMorgan Chase Bank in Federal District Court in the District of Arizona claiming a violation of the Fair Credit Reporting Act (FCRA). (Doc. 1). Chase moved for summary judgement on May 24, 2022. (Doc. 54). Plaintiff filed a response on July 7, 2022 (Doc. 60), and Chase Replied on July 22, 2022. (Doc. 61).

## III.    LEGAL STANDARD

### a.  Summary Judgment

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must

support that assertion by ... citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits, or declarations, stipulations ... admissions, interrogatory answers, or other materials," or by "showing that materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." *Id.* 56(c)(1)(A-B). Thus, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

Initially, the movant bears the burden of demonstrating to the Court the basis for the motion and the elements of the cause of action upon which the non-movant will be unable to establish a genuine issue of material fact. *Id.* at 323. The burden then shifts to the non-movant to establish the existence of material fact. *Id.* A material fact is any factual issue that may affect the outcome of the case under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The non-movant "must do more than simply show that there is some metaphysical doubt as to the material facts" by "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (quoting Fed. R. Civ. P. 56(e)). A dispute about a fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 248. The non-movant's bare assertions, standing alone, are insufficient to create a material issue of fact and defeat a motion for summary judgment. *Id.* at 247–48. In the summary judgment context, however, the Court construes all disputed facts in the light most favorable to the non-moving party. *Ellison*, 357 F.3d at 1075.

At the summary judgment stage, the Court's role is to determine whether there is a genuine issue available for trial. There is no issue for trial unless there is sufficient evidence in favor of the non-moving party for a jury to return a verdict for the non-moving party. *Liberty Lobby, Inc.*, 477 U.S. at 249–50. "If the evidence is merely colorable, or is not

significantly probative, summary judgment may be granted." *Id.* (citations omitted). In the context of the FCRA and questions of reasonableness, "summary judgement is generally an inappropriate way to decide [such questions] ... because the jury's unique competence in applying the reasonable man standard is thought ordinarily to preclude summary judgement." *In re Software Toolworks Inc.*, 50 F.3d 615, 621 (9th Cir.1994) (internal quotations omitted). Yet it can be granted when there is only one possible conclusion about the conduct's reasonableness. *See Gorman v. Wolpoff & Abramson, LLP*, 583 F. 3d 1147, 1157 (9th Cir. 2009).

### b. Fair Credit Reporting Act

The Fair Credit Reporting Act sets forth a set of procedures for entities involved in the extension and reporting of credit. *See* 15 U.S.C. § 1681. Its aim is to improve the accuracy of credit reporting while ensuring the privacy of consumers. *See id.* There are three main entities that are either covered or regulated by FCRA: consumers, furnishers, and Consumer Reporting Agencies. *See* 15 U.S.C §§ 1681a, 1681s-2. When consumers want to dispute the accuracy of their credit reports, the FCRA lays out very specific procedures that all three entities must follow. If a consumer believes that there is an inaccuracy in his report, he has the option of formally disputing his report with a CRA. 15 U.S.C. § 1681i. This triggers a series of requirements in both the CRA and the information furnishers.

Upon notice that a consumer has disputed the accuracy of a credit report, "the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file ...." *Id.* The CRA has thirty days in which to conduct this reinvestigation. *See id.* As part of this reinvestigation, the CRA must notify the original furnisher that an item of information is being disputed. *See id.* The notice must include all of the information that the CRA received from the consumer about the dispute. *See id.* All furnishers have a duty under the Act to ensure that the information they are providing is accurate. *Id.* at § 1681s-2(a)(1)(A). The FCRA states that a furnisher shall not knowingly

provide "any information relating to a consumer to any consumer reporting agency if the [furnisher] ... knows or has reasonable cause to believe that the information is inaccurate." *Id.* This coincides with their duty to conduct an investigation when they receive notice of a dispute from a CRA. *See id.* at § 1681(b)(1)(A).

Specifically, when conducting an investigation, a furnisher must review relevant information provided by the CRA and report the results of the investigation back to the CRA. *See id.* If an inaccuracy is found, that must be reported to all CRAs to which the original piece of information was reported. *See id.* The furnisher must then modify or delete that inaccurate item or must permanently block reporting of it. *See id.*

In order to show that a furnisher's investigation was unreasonable, a plaintiff must make a prima facie showing that there was an inaccuracy in the credit report. *See Gross v. CityMortgage, Inc.*, 33 F.4th 1246, 1251 (9th Cir. 2022). Once this has been shown, then plaintiff must show that the investigation itself was unreasonable. *See id.* As this circuit has noted "this order of proof makes sense: if there is no inaccuracy, then the reasonableness of the investigation is not in play." *See id.* When assessing the accuracy of a report, it should be noted that not every misstatement constitutes an inaccuracy. Credit entries are "incomplete or inaccurate" under the FCRA only when they are patently incorrect, or because [they] ... are misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163. And information is only materially misleading when it is "open to an interpretation that is directly contradictory to the true information." *Gross v. Private National Mortgage Acceptance Co., LLC*, 512 F.Supp.3d 423, 427 (E.D. NY 2021). In making this assessment, the Court must view the report as a whole. This approach is in line with opinions from courts across the country. *See e.g. Settles v. Trans Union LLC*, No. 3:20-cv-00084, 2020 WL 690302, *4 (M.D. Tenn. Nov. 24, 2020); *Bibbs v. Trans Union LLC*, 521 F.Supp.3d 569, 571 (E.D. Penn 2021); *Bibbs v. Trans Union LLC*, 43 F.4th 331, 342 (3rd Cir. 2022); *Samoura v. Trans Union LLC*, NO. 20-5178, 2021 WL 915723, *5 (E.D. Pa. Mar. 10, 2021); *Schweitzer v. Equifax Information Solutions LLC*, 441 Fed.Appx. 896, 902 (3rd Cir.

2011); *Hernandez v. Trans Union LLC*, No. 3:19cv1987, 2020 WL 8368221, *3 (N.D. Fl. Dec. 10, 2020) ("in determining if a credit report is both true and unlikely to lead to misunderstanding, the report must be reviewed and considered in its entirety, instead of focusing on a single field of data."). A court must assess the entire tradeline in order to determine the accuracy of any piece of information.

Only once it is determined that a piece of information reported is patently incorrect or materially misleading can a court move on to the next step of determining whether the investigation conducted by a furnisher was reasonable.[2] *See Gross*, 33 F.4th at 1251. As its most basic, a reasonable investigation entails an "inquiry likely to turn up information about the underlying facts and positions of the parties, not a cursory or sloppy review of the dispute." *Gorman*, 584 F.3d at 1156. As the Eleventh Circuit has noted, an investigation cannot be said to be unreasonable if it cannot be shown that "had the furnisher conducted a reasonable investigation, the result would have been different ..." *Felts v. Wells Fargo Bank, N.A.*, 893 F.3d 1305, 1313 (11th Cir. 2018). In assessing reasonableness, there are number of factors that the court can consider. These include the nature, size, complexity and scope of the furnisher's activities; the furnisher's relationship to the consumer and the debt; the level of detail in the dispute notice; and the feasibility of implementing investigatory procedures. *See Gross*, 33 F.4th at 1253. Another key factor is the amount of information that the furnisher received from the CRA regarding the dispute. *See Gorman*, 583 F.3d at 1157. It should be noted that it is not per se unreasonable for a furnisher to rely solely on internal records when conducting an investigation. *See Gorman*, 584 F.3d at 1160. Indeed, "an investigation does not have to be exhaustive to be reasonable[,]" and a furnisher may "balance the costs and benefits of engaging in additional procedures."

---

[2] The text of 15 U.S.C. § 1681s-2(b) only states that a furnisher must "conduct an investigation with respect to the disputed information[.]" The text of 15 U.S.C. § 1681i, which governs the reinvestigation duties of CRAs, states that upon notice of dispute, a CRA must "conduct a reasonable reinvestigation ..." Despite this distinction, the Ninth Circuit has held that a furnisher's investigation must "not be unreasonable." *Gorman v. Wolpoff & Abramson, LLP*, 584 F.3d 1147, 1157 (9th Cir. 2009).

*Maiteki v. Marten Transportation Ltd.*, 828 F.3d 1272, 1276 (10th Cir. 2016). Ultimately, the Court is assessing whether the investigation is one that a "reasonably prudent person" would undertake given the circumstances. *Id.* at 1275.

### IV. JPMORGAN CHASE BANK'S MOTION FOR SUMMARY JUDGMENT
#### a. Nonmutual Offensive Collateral Estoppel

Plaintiff asserts that Chase cannot claim that its reporting was accurate because it is estopped from doing so. Because Chase lost in the allegedly factually similar *Macik* and *Sofiev* cases, it is collaterally estopped from claiming its reporting was accurate here, Plaintiff claims. (*See* Doc. 60 at 13–14). Usually, the doctrine of collateral estoppel is applied when the parties in each case are the same. *See Parklane Hoisery co., Inc. v. Shore*, 439 U.S. 322, 326–27 (1979). Yet, the Supreme Court has conditionally approved of the application of the doctrine where the Plaintiff is different. *See id.* at 331. There are three general elements that must be proven for collateral estoppel to apply: 1. the same issue must be involved, 2. that issue must have been "actually litigated and determined by a valid final judgment," 3. and that determination must have been "essential to the judgment ...." *B&B Hardware, Inc. v. Hargis Industries, Inc.*, 575 U.S. 138, 148 (2015). If Plaintiff can prove that these cases involved the exact same issues as those involved in this case, then collateral estoppel is appropriate.

This Court finds that it is not. Fundamentally collateral estoppel applies in cases involving an "identical issue." *See Parklane*, 439 U.S. at 326. The requirement that the issues be identical runs throughout Supreme Court caselaw. The Court in *C.I.R. v. Sunnen* noted that collateral estoppel "must be confined to situations where the matter raised in the second suit is *identical in all respects* with that decided in the first proceeding and where the controlling facts and applicable legal rules remain unchanged. *C.I.R. v. Sunnen*, 333 U.S. 591, 599–600 (1948) (emphasis added). Later, in *United States v. Stauffer Chemical Co.*, the Court stated that collateral estoppel is applicable to "preclude relitigation of the same issue already litigated against the same party in another case involving *virtually identical facts*." *United States v. Stauffer Chemical Co.*, 464 U.S. 165, 169 (1984)

(emphasis added). And more recently in *B & B Hardware*, the Court held that "issue preclusion applies where the issues in the two cases are indeed identical ...." *B & B Hardware*, 575 U.S. at 153. The issues and facts involved in the first and second cases, then, must be the same. The significant and material differences between *Macik* and this case preclude the application of nonmutual offensive collateral estoppel here.

First, this Court does not even need to analyze the similarity between this case and *Sofiev v. TransUnion, LLC*. In that case Chase's motion for summary judgment was denied and the parties ultimately settled. (*See* Doc. 60-13 at 2); Notice of Settlement as to Chase only, *Sofiev v. Trans Union, LLC*, 1:20cv00697 (S.D.N.Y. Oct. 27, 2021). Thus, the issue was not "actually litigated and determined by a valid final judgment[.]" *B & B Hardware*, 575 U.S. at 148. This case cannot serve as a basis for claiming collateral estoppel.

Second, although the allegedly similar issues were actually litigated and essential to the judgment in *Macik*, they are not virtually identical to the issues in this case. *Macik* involved a completely different loan type, a mortgage, that had completely different credit score consequences. This dispute involves a line of credit. Second, the plaintiff in *Macik* paid off the entirety of her loan, including the payments that she had previously missed. *See Macik*, 2015 WL at *1. Here, Plaintiff settled her account for less than she owed. Although both cases involve a dispute over the accuracy of reporting a delinquency in the "Pay Status" field, the factual situations are quite different. For collateral estoppel to apply, the facts need to be more than similar, they need to be "identical in all respects[.]" *C.I.R*, 333 U.S. at 599–600.

Furthermore, even if the two cases were similar enough to meet the standards for nonmutual offensive collateral estoppel, "trial courts [have] broad discretion to determine when it should be applied." *Parklane Hosiery Co., Inc.*, 439 U.S. at 331. In determining whether collateral estoppel applies, judges look to a series of factors that assess fairness to the defendant. These include whether the Plaintiff was incentivized to adopt a wait and see attitude, whether Defendant had an incentive to defend the first suit vigorously, whether the judgment that forms the basis for the estoppel claim is inconsistent with one or more

previous judgments in Defendant's favor, and whether the second action affords the Defendant procedural opportunities that that first did not. *See id.* at 330–31. Generally, a court can look to these and any other indications of unfairness to make this determination. *See id.* at 331. What persuades the Court the most here is that there are numerous cases from around the country that have found that reporting delinquencies to CRAs in factually similar circumstances[3] is not inaccurate reporting under the FCRA. *See, e.g.*, *Samoura*, 2021 WL 915723; *Private National Mortgage Acceptance Co., LLC*, 512 F.Supp.3d 423; *Settles*, 2020 WL 690302. In this context, it would be patently unfair to bar Chase from defending itself. This Court holds that nonmutual offensive collateral estoppel does not apply here.

### b. Inaccurate Information

Chase asserts that summary judgment is appropriate because it never reported any inaccurate information. Thus, Plaintiff cannot make the prima facie showing necessary to bring a claim under the FCRA. This Court finds that Chase's reporting was accurate. Chase argues that the information reported in the "Pay Status" field is historical account information. (*See* Doc. 54 at 5). The other pieces of information on the tradeline, it claims, make this clear. (*See id.*). When the tradeline is viewed as a whole, then, Chase contends, it is clear to any reader that the information reflects only that at some point Plaintiff was 120 days delinquent on her account. (*See id.* at 10). This is exactly how the caselaw tells courts to look at tradelines in FCRA "failure to undertake a reasonable investigation" cases. The tradeline must be viewed as a whole. Courts cannot look at the piece of allegedly inaccurate information in isolation. As Plaintiff alleges, her tradeline does read "Pay Status: Account 120 Days Past Due Date." (Doc. 54 at 5). Yet this is neither patently inaccurate nor materially misleading. When "Pay Status" is looked at in conjunction with the other items reported on her tradeline, it becomes obvious that the tradeline is reporting a historical pay status. Her tradeline lists her balance as zero, shows that the last payment was made in September of 2018, notes that the account was closed in 2018, and that it was

---

[3] Note that the Court is using the term "factually similar" and not identical.

settled for less than the full balance. (*See id.*). Furthermore, no account information is provided for dates after September 2018. (*See id.*). Her tradeline also notes the months during which she was delinquent. (*See id.*). Finally, nowhere on the tradeline does it state that it is reporting a "current" pay status. (*See id.*). No reasonable reader could look at all of these facts and still believe that her Pay Status represents a current debt. Thus, the information reported is not patently inaccurate or materially misleading.

Many other courts have held that there was no inaccuracy in similar circumstances. *Settles v. Trans Union* involved a customer who had defaulted on an education loan. *See Settles*, 2020 WL 690302 at *1. After his account was closed and transferred, his tradeline reported his "Pay Status" as 120 days past due. *See id.* Four years later, he disputed the Pay Status claiming that it inaccurately portrayed him as currently delinquent. *See id.* The *Settles* court found that the reported information, "taken as a whole, is neither inaccurate nor materially misleading. *See id.* at *4. It noted that the tradeline stated that the account was closed and did not provide any account information after the closing date. *See id.* It also pointed to the fact that, like Plaintiff's tradeline in this case, the tradeline noted the months during which he was late. *See id.* Given this context, the court noted, the tradeline "would not reasonably mislead a creditor to believe Plaintiff is currently past due on this loan." *See id. Gross v. Private National Mortgage Acceptance Co. LLC*, involved a plaintiff who had a "Pay Status" of "30 days past due date." *See Private National Mortgage Acceptance Co., LLC*, 512 F.Supp.3d at 425. He similarly argued that the tradeline was incorrectly reporting that he was currently delinquent. *See id.* Again, the court held that when read in light of the entire context of the tradeline, this information was not materially misleading. *See id.* at 426–27. The tradeline showed that the account was closed and had a zero balance. *See id.* at 427. It also showed when the last payment was made and that the account had been transferred. *See id.* The court stated that when "[r]eading these entries together, the only logical inference is that the account was *previously* 30 days past due." *Id.* (emphasis in original). Finally, in *Bibbs v. Trans Union*, the court also found that reporting a 120-day delinquency in the "Pay Status" field was not inaccurate or materially

misleading. *See Bibbs*, 521 F.Supp.3d at 571. Noting that the "Pay Status" field "does not contain a present tense verb," the court went on to highlight the fact that the tradeline indicated when it was last updated and included data which showed that the account was closed with a zero balance. *See id.* at 579–80. This showed that the "Pay Status" field reported historical information. *See id.*

This court is persuaded by these cases upholding the accuracy of the reporting of delinquency information in the "Pay Status" field. It does not make sense to read Pay Status, or any other piece of information in isolation. Were this Court do so, it would be ignoring important context that gives meaning to the words at issue. Just as courts interpret statutory text by looking to the context of the section or statute as a whole, so too do we interpret tradelines in cases such as these. It is possible that Chase or the CRAs could have reported this information more clearly. Yet that is not what the statute requires.

Plaintiff counters that Chase provided information to the CRAs that indicated that her debt was current, which was then reported in the "Pay Status" field. (Doc. 60 at 11). Thus, she claims, the "Pay Status" field is inaccurately reporting that she is currently 120 days delinquent. (*See id.*). Plaintiff points to the fact that Chase reported delinquency information in the "Payment Rating" field and the "Account Status" fields to the CRAs. (Doc. 60 at 11). These fields, she claims, are reserved for "current consumer credit information." Plaintiff draws on the definitions of each field set out in the Metro 2 guidelines. She notes that "Payment Rating" is defined as "a code that properly identifies whether the account was current, past due, in collections, or charged off prior to the status and ***within the current month's reporting period.***" (*See* Doc. 60 at 11; Doc. 54-12 at 31 (emphasis in original)). "Account Status," she states, is defined as a "***status code that properly identifies the current condition of the account*** as of the Date of Account Information." (Doc. 60 at 11(emphasis in original); Doc 54-12 at 31). This, she urges, shows that these fields are reserved for current delinquency information. (Doc. 60 at 11).

Defendant correctly replies that this is an incomplete reading of the Metro 2 definitions. (Doc. 61 at 6). It is true that the definition of "Account Status" includes the

phrase "current condition of the account," but it goes on to say "*as of the Date of Account Information (Field 24)*" (Doc. 54-12 at 31 (emphasis added")). Field 24, the "Date of Account Information" states that when the Account Status Code is "13" then the Date of Account Information is the date the account was paid. (Doc. 54-12 at 36). Code 13 indicates that the account was paid or closed with a zero balance. (Doc. 54-12 at 39). Plaintiff's Account Status was accurately marked with code 13. (*See* Doc. 54-2 at 2). Thus, the date of her Account Status would be the date the account was paid. Furthermore, the definition of the "Payment Rating" field states that when the Account Status is assigned code 13, the payment rating field "must also be reported." (Doc. 54-12 at 31). Chase, then, was required to report a payment rating. And it would be logical to conclude that the "Payment Rating" field indicated the payment rating on the same date as the date of the account status. This is confirmed by the definition of "Payment Rating" itself. The Metro 2 standards state that the "Payment Rating" field contains a code that identifies "whether the account was current, past due, in collections or charged off ***prior to the status*** ...." (Doc. 54-12 at 31). The "Payment Rating" field thus indicates what the payment rating was just prior to the account being paid, the date of the account *status*, not what the current rating is. Reading the entirety of the definitions of these terms makes this clear.

In response to the claim that reading the tradeline as a whole makes it clear that the "Pay Status" field reflects a historical delinquency, Plaintiff has an expert who will testify that interpretations of tradelines are done electronically by programs that scan specific fields. (Doc 60 at 11). Yet this does not create a dispute over a material fact. The legal standard is that the information furnished must be patently incorrect or "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163. This means that what the furnisher included or did not include in the report was extremely misleading. As one court has described it, information furnished by a furnisher is materially misleading when it "is open to an interpretation that is *directly contradictory* to the true information" *Private National Mortgage Acceptance Co., LLC*, 512 F.Supp.3d at 426 (emphasis added). As shown above, Chase provided

- 13 -

accurate information and did so in accordance with the Metro 2 standards. The fact that some companies that view credit reports might use software that does not read credit reports correctly does not mean that Chase furnished materially misleading information. The statute governs what furnishers report not the quality of a creditor's interpretation.

Finally, Plaintiff cites to an unreported, out of circuit district court report and recommendation[4], which she claims found that reporting a delinquency in the "Pay Status" field, in an allegedly factually similar circumstance, was an inaccuracy. (*See* Doc. 60 at 12). *Macik v. JPMorgan Chase Bank, N.A.*, involved woman who missed three monthly mortgage payments and had a delinquency reported in her "Pay Status" field on her credit report. *See Macik v. JPMorgan Chase Bank, N.A.*, NO. 6-14-044, 2015 WL 12999728, *1 (S.D. Tex. May 28, 2015). Despite the fact that she subsequently sold her house and paid off the mortgage, including the missed payments, her credit report still noted that she was delinquent four years later. *See id.* The court found that there was a disputed issue of material fact as to whether Chase was reporting a current delinquency. *See id.* at *4.

Obviously, this case has no precedential value, and its unreported status detracts from its persuasive value. Additionally, as discussed more fully below, this Court reads the Metro 2 standards differently. The *Macik* court read the definition of the "Account Status" field as saying that the account status reflects the current condition of an account. *See id.* at *4, Yet this reading of the definition, much like Plaintiff's reading, ignores the second half of the sentence, "as of the Date of Account Information." As explained above, the Date of Account Information in such situations is the date the account was paid. Thus, it cannot reflect the account's current status. The court then reasoned that the "Payment Rating field is merely a ***subset*** of The Account Status that is only utilized in reporting when the Account Status field contains specified codes." *See id.* (internal quotations omitted) (emphasis in original). Thus, it concluded that the "Payment Rating" field contained the account's rating as of the same date as that of the Account Status. This Court agrees with this section of the analysis. But given that the "Account Status" field contains information as of the date the

---

[4] The report and recommendation was ultimately adopted without comment. *See Macik v. Trans Union, LLC*, 3:14-CV-0044, 2015 WL 12999727 (S.D. Tex. July 31, 2015).

account was paid, the "Pay Status" field also contains information as of that same date.

Moreover, *Macik* is factually different from this case. *Macik* involved a mortgage loan, not a credit card. This distinction is important because of how each type of debt is treated when a person is applying for a mortgage loan. As Chases unrebutted expert notes, "Fanny Mae DU would deny a mortgage application with a current past due mortgage account on the applicant's credit report but would not deny a mortgage application because of a current past due credit card account." (Doc. 54-20 at 3). In *Macik*, then, there was a chance that Chase's reporting was "misleading in such a way and to such an extent that it can be expected to adversely affect credit decisions." *Gorman*, 584 F.3d at 1163. Here, Plaintiff alleges that she did not apply for a mortgage because of the reporting about her credit card debt. According to Chase's expert, this type of debt would not affect a mortgage decision. Additionally, *Macik* is different because the plaintiff in that case paid off her debt in full before the account was closed. Here, Plaintiff settled and paid a lesser amount. She did not comply with the terms of her original loan obligation. *Macik* is, thus, not on point.

There are no disputed issues of material fact that warrant letting this case go to a jury. Looking to the tradeline as a whole, and to the information that Chase furnished to the CRAs, this Court holds that Chase's reporting was not incomplete or inaccurate. *See* 15 U.S.C. § 1681s-2(b). Consequently, Plaintiff has failed to make the showing necessary to bring an unreasonable investigation claim under the FCRA. Summary judgement is, thus, appropriate. *See Celotex Corp.*, 477 U.S. at 322.

### c. Unreasonable Investigation

Even were this Court to find that Chase reported inaccurate information, Plaintiff would still have to prove that if the furnisher had conducted a reasonable investigation, it would have found that it was reporting inaccurately. *See Felts*, 893 F.3d at 1313. This Court finds that Chase's investigation was entirely reasonable under the circumstances. One of the most important factors in assessing reasonableness is the quality and type of information that the furnisher received from the CRA when it was notified of the dispute. *See Gross*, 33 F.4th at 1253. Chase only received two pieces of information relating to the

dispute: 1. that it was incorrect to report a "Payment Status" of "Late 120 Days[,]" and 2. that the "Date of Last Payment" in the Account Details section was not similar to the "information provided in the Payment History[,]" (Doc. 54-1 at 3). The second piece of information has nothing to do with the reporting of her delinquency. Given the first piece of information, Chase could only have concluded that either something was factually inaccurate with the reporting that Plaintiff was at one time 120 days late or that the information was being reported improperly. Chase looked to its internal notes and verified the account status, the payment rating, and the account history. (*See* Doc. 54-14 at 2). It also verified the accuracy of the date opened, the date of last payment, and the date the account was closed. (*See id.*). Further, it validated a number of other pieces of information. (*See id.* at 3). It thus made sure that the information it was furnishing was technically accurate.

Chase also made sure that the information was being furnished in line with Metro 2 standards. This is undisputed as Plaintiff's expert witness agreed that Chase's reporting of her credit information was in line with Metro 2 Standards. (*See* Doc. 54-11 at 6). Metro 2 is the industry standard for reporting account information. (*See* Doc. 54 at 6). These standards are created by the Credit Data Industry Association (CDIA). (*See* Doc. 54-12 at 2). The CDIA publishes this guide to "advise furnishers how to provide accurate information ...." *In re Anzaldo*, 612 B.R. 205, 211 (S.D. Calif. 2020); *See id.* at 12. Compliance with it and checking to make sure that Plaintiff's credit information was being reported consistently with it suggests that Chase's investigation was reasonable.

Plaintiff claims that Chase should have done more. Specifically, she asserts that Chase should have pulled a "bullseye" report. (*See* Doc. 60 at 18). A "bullseye" report is an Experian product that allows a furnisher to see all of a consumer's tradelines as they appear on his credit report. (*See* Doc. 54-13 at 32). Equifax has its own version called "Automated Data View." (*See id.*). Plaintiff argues that had Chase pulled a "bullseye" report it would have seen that the report indicated that the account was marked as past due but not marked "paid in full with a zero-dollar balance." (Doc. 60 at 18). It did not indicate

these things, she asserts, because it did not show an "Account Status." (*See id.*). This assertion is completely inaccurate. Although it is true that the report, which Chase ultimately pulled (*See* Doc. 54 at 14), does not include an "Account Status" field, it does list the date the account was closed, and states "ACCOUNT PAID FOR LESS THAN FULL BALANCE[.]" (*See* Doc. 54-23 at 3). It also lists the balance as zero. (*See id.*). The report contained all of the information that Chase already had and was reporting. Pulling a "Bullseye" report would not have aided Chase's investigation. And it certainly would not have led Chase to find that it was reporting inaccurately. Consequently, this Court finds that Chase conducted a reasonable investigation.

### d. Damages

Because there were no inaccuracies, the investigation was reasonable, and Chase was not collaterally estopped from raising the arguments it did, this Court also grants summary judgement in favor of Chase on the issue of damages. Chase fully complied with its duties under the FCRA. Thus, there can be no material dispute over damages because Chase did not violate the law.

### e. Protective Order

This Court entered a protective order in this case that specifically stated that in the event that one party wishes to use another party's confidential information to support or oppose a motion, that party "shall notify the producing party at least two weeks before the filing in which they wish to reference the document is due ...." Plaintiff used Chase's confidential material to oppose its motion for summary judgement and did not give the required two weeks notice. (*See* Doc. 61 at 15). In fact, it only gave a few hours notice. (*See id.*). This constitutes a clear violation of the protective order. The Clerk's office is not able to strike information from the public record on a line-by-line or exhibit-by-exhibit basis, however. And Defendant has not moved to seal. Consequently, the remedy requested of striking Plaintiff's Opp. (Doc. 60) at 16:2-8, and Ex. N (Doc. 60-15), n.2 is not available.

## V.   CONCLUSION

Accordingly,

**IT IS ORDERED THAT** JPMorgan Chase Bank, N.A.'s Motion for Summary Judgment (Doc. 54) is **GRANTED**, as set forth above.

**IT IS FURTHER ORDERED THAT** JPMorgan Chase Bank, N.A.'s Motion to Exclude Expert Testimony (Doc. 55) is **DENIED** as moot.

**IT IS FURTHER ORDERED THAT** the Clerk of the Court shall enter judgment, accordingly.

Dated this 2nd day of December, 2022.

_____
James A. Teilborg
Senior United States District Judge